E-FILED
Monday, 16 November, 2020  03:33:59 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| STEPHANIE N., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-04122-SLD-JEH |
| | ) | |
| ANDREW SAUL, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

Before the Court are Plaintiff Stephanie N.'s Motion for Summary Judgment, ECF No.

12; Defendant Commissioner of the Social Security Administration Andrew Saul's

("Commissioner") Motion for Summary Affirmance, ECF No. 16; Magistrate Judge Jonathan

Hawley's Report and Recommendation ("R&R"), ECF No. 19, recommending that the Court

deny Stephanie's motion and grant the Commissioner's; and Stephanie's objections to the R&R,

ECF No. 20.  For the reasons that follow, the objections are OVERRULED, the R&R is

ADOPTED, the Motion for Summary Judgment is DENIED, and the Motion for Summary

Affirmance is GRANTED.

BACKGROUND[1]

I.      Procedural Background

In 2016, Stephanie applied for disability insurance benefits and supplemental security

income, alleging disability beginning January 1, 2014.  Her application was denied initially and

on reconsideration.  At Stephanie's request, a hearing was held before an administrative law

judge ("ALJ") on November 28, 2017.  The ALJ issued a decision denying Stephanie's claim for

---

[1] Judge Hawley's R&R provides a detailed summary of the background of this case and the ALJ's decision.  *See*
R&R 1–6.  The administrative record can be found at ECF No. 8.  Citations to the record take the form: R. __.

4:19-cv-04122-SLD-JEH   # 22   Page 2 of 23

benefits on April 11, 2018.  The Appeals Council denied Stephanie's request for review, so the

ALJ's April 11, 2018 decision is the final decision of the Commissioner.  *See Nelms v. Astrue*,

553 F.3d 1093, 1097 (7th Cir. 2009).  Stephanie seeks judicial review of the Commissioner's

decision pursuant to 42 U.S.C. § 405(g).  Compl. 1, ECF No. 1.[2]  She filed a motion for

summary judgment, and the Commissioner filed a motion for summary affirmance.  The matter

was referred to Judge Hawley for a recommended disposition, and he entered his R&R on July

29, 2020.  Stephanie timely filed objections.

## II.    ALJ Decision

The ALJ conducted the standard five-step sequential analysis set forth in 20 C.F.R.

§ 404.1520(a)(4),[3] concluding that Stephanie was not disabled.  At step one, she found that

Stephanie had not engaged in substantial gainful activity since January 1, 2014, the alleged onset

date.  R. 20.  At step two, she found that Stephanie had the following severe impairments:

bilateral hip bursitis, obesity, fibromyalgia, depression, posttraumatic stress disorder, and

anxiety.  *Id.* at 21.  At step three, she found that none of Stephanie's impairments met or equaled

the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* at 21–23.

Next, the ALJ found that Stephanie had the residual functional capacity ("RFC") "to perform

light work . . . except she c[ould] perform work that can be learned in 30 days or less, with

simple routine tasks, simple work-related decisions and routine work place changes; with

occasional interaction with coworkers with no tandem tasks; occasional interaction with

supervisors, and no interaction with the general public."  *Id.* at 23–28.  At step four, the ALJ

---

[2] 42 U.S.C. § 1383(c)(3) provides that "[t]he final determination of the Commissioner of Social Security" on an
application for supplemental security income "shall be subject to judicial review as provided in section 405(g) of
this title to the same extent as the Commissioner's final determinations under section 405 of this title."
[3] The standards for establishing a disability to receive disability insurance benefits and supplemental security income
are materially the same.  *Compare* 20 C.F.R. §§ 404.1501–404.1576 (disability insurance benefits), *with id.* §§
416.901–416.976 (supplemental security income).  For efficiency, the Court will cite only to the disability insurance
benefit regulations.

found that Stephanie was unable to perform her past relevant work.  *Id.* at 28.  At step five, she found that there were jobs that existed in significant numbers in the national economy—specifically, cleaner or patch worker, domestic laundry worker, and housekeeper—that Stephanie could perform.  *Id.* at 29.  Accordingly, the ALJ found that Stephanie was not disabled, *id.*, and denied her application for benefits, *id.* at 30.

## DISCUSSION

### I.    Legal Standards

When a magistrate judge considers a pretrial matter dispositive of a party's claim or defense, he must enter a recommended disposition.  Fed. R. Civ. P. 72(b)(1).  Parties may object within fourteen days of being served with a copy of the recommended disposition.  *Id.* 72(b)(2).  The district judge considers de novo the portions of the recommended disposition that were properly objected to, and may accept, reject, or modify the recommended disposition, or return it to the magistrate judge for further proceedings.  *Id.* 72(b)(3).  The district judge reviews the unobjected portions of the recommendation for clear error only.  *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

The court reviews a decision denying benefits to determine only whether the ALJ applied the correct legal standard and whether substantial evidence supports the ALJ's decision.  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quotation marks omitted).  The ALJ does not have "to provide a complete and written evaluation of every piece of testimony and evidence, but must build a logical bridge from the evidence to his conclusion."  *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (quotation marks omitted).  On review, the court cannot reweigh the

evidence, decide questions of credibility, or substitute its own judgment, but must "nonetheless conduct a critical review of the evidence." *McKinzey*, 641 F.3d at 889.

## II.     Analysis

In support of her motion for summary judgment, Stephanie made four arguments: 1) the ALJ improperly dismissed her treating nurse practitioner's opinion, Mem. Supp. Mot. Summ. J. 4–7, ECF No. 13; 2) the ALJ failed to include all of her mental limitations into the hypothetical given to the vocational expert ("VE") and the RFC finding, *id.* at 7–10; 3) the ALJ erred in evaluating her subjective symptoms, *id.* at 10–15; and 4) the VE's testimony conflicted with Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 (Dec. 4, 2000),[4] and the ALJ never asked the VE for the source of his data or his methodology for determining the number of jobs available in the national economy, Mem. Supp. Mot. Summ. J. 15–17.  Judge Hawley recommends rejecting each of Stephanie's arguments.  *See* R&R 8–23.  Stephanie objects to the R&R's resolution of the first three arguments, Objections 1–4, so the Court considers those issues de novo in the same order they are addressed in the R&R.  The Court has reviewed the remainder of the R&R for clear error only and found none.

### a.  Subjective Symptom Analysis

Stephanie raised wide-ranging challenges to the ALJ's subjective symptom analysis in support of her motion for summary judgment, Mem. Supp. Mot. Summ. J. 10–15 (arguing, for example, that the ALJ should have solicited information from Stephanie's therapist, that the ALJ did not explain how her daily activities contradicted her symptoms, and that the ALJ failed to cite to specific medical evidence that contradicted her symptoms), which Judge Hawley

---

[4] SSRs "are interpretive rules intended to offer guidance to agency adjudicators.  While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration."  *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (citation and quotation marks omitted); *see* 20 C.F.R. § 402.35(b)(1).

addressed, *see* R&R 8–13.  Her objection to the R&R is narrowed.  She argues that the ALJ and

R&R "unfairly and vaguely rationalize[d] that [her] fibromyalgia was under control since 2017

because of medication usage, but d[id] not account for the waxing and waning nature of the

nerve condition prior to assessing it to be controlled," Objections 2; that both the ALJ and "the

R&R failed to account for [her] use of prescribed Seroquel nightly, Wellbutrin twice daily, and

hydroxyzine as needed for her anxiety as well as Cymbalta" and failed to consider the side

effects of her medication, *id.*; and that the R&R failed to "explain why the ALJ omitted the fact

that [she], as of February 3, 2017, required an 'emotional support animal' in order to manage her

symptoms and function on a daily basis," *id.* at 2–3.

> SSR 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017), provides:
>
> In considering the intensity, persistence, and limiting effects of an individual's
> symptoms, [the ALJ] examine[s] the entire case record, including the objective
> medical evidence; an individual's statements about the intensity, persistence, and
> limiting effects of symptoms; statements and other information provided by
> medical sources and other persons; and any other relevant evidence in the
> individual's case record.

The ALJ must "evaluate whether [an individual's] statements [about the intensity, persistence,

and limiting effects of her symptoms] are consistent with objective medical evidence and the

other evidence [in the record]."  *Id.* at *6.  The ALJ can also consider an individual's daily

activities, factors that precipitate or aggravate symptoms, medications used to alleviate pain or

other symptoms and any side effects of those medications, and any other treatment or measures

the claimant uses to relieve symptoms.  *Id.* at *7–8.

In her decision denying Stephanie benefits, the ALJ found that Stephanie's "medically

determinable impairments could reasonably be expected to cause some of [her] alleged

symptoms," but her "statements concerning the intensity, persistence and limiting effects of these

symptoms [we]re not entirely consistent with the medical evidence and other evidence in the

record." R. 24. Specifically with respect to Stephanie's physical limitations, the ALJ concluded that Stephanie's "reported symptoms of pain, fatigue and limited range of motion resulting from her physical impairments [we]re consistent with the medical and other evidence of record to the extent she [wa]s limited to a range of light work." *Id.* In support of this conclusion, the ALJ provided a discussion of the relevant medical evidence which supported finding that Stephanie had physical limitations due to fibromyalgia and hip bursitis. *Id.*

But she also explained why she found "the record . . . not consistent with finding [Stephanie] completely unable to work." *Id.* at 25. For example, she provided five specific reasons why she found Stephanie's statements about the disabling effects of her fibromyalgia inconsistent with the record. First, the record showed that Stephanie did not complain of chronic pain until almost two years after her alleged date of onset. *Id.* Second, Stephanie waited to seek treatment from a rheumatology specialist and as of the date of the hearing, had not seen a pain specialist or a rheumatologist (instead, she only saw a physician's assistant). *Id.* Third, Stephanie "consistently presented in no acute distress with good strength in all muscle groups and all extremities, no joint swelling or stiffness and a normal gait." *Id.* Fourth, sensory and physical examinations were normal despite Stephanie's allegations of numbness and weakness in her extremities. *Id*. And fifth, "the record show[ed] [Stephanie's] fibromyalgia symptoms ha[d] been controlled since August 2017." *Id.*

The ALJ also provided four specific reasons why she found the record inconsistent with finding Stephanie unable to work because of hip bursitis. *Id.* First, again, Stephanie did not report pain until well after the alleged disability onset date. *Id.* Second, she only received one injection for her pain; injections had been neither requested nor recommended since, "suggesting [Stephanie's] pain did not require that level of treatment." *Id.* Third, she did not demonstrate

6

hip swelling and consistently had normal range of motion and strength in her hips.  *Id.*  And

fourth, surgery was not recommended.  *Id.*

The ALJ also determined that Stephanie's "activities of daily living [we]re not consistent

with those of an individual with disabling physical impairments."  *Id.* at 25.  The ALJ

highlighted that Stephanie went up and down stairs several times daily, prepared meals, and

performed household chores.  *Id.* at 25–26.  The ALJ also noted that Stephanie babysat a toddler

three days a week at least into 2015, over a year after the alleged onset date.  *Id.* at 26.  The ALJ

did not indicate that these activities meant Stephanie could perform full time work, but rather

that they suggested "greater functional capabilities than" she alleged.  *Id.*  Considering the above

described analysis, the ALJ clearly articulated her reasons for finding that Stephanie's symptoms

were not as limiting as she alleged.  The decision is specific, cites to the record, and

acknowledges contrary evidence.

Stephanie argues that the ALJ "unfairly and vaguely rationalize[d] that [her] fibromyalgia

was under control since 2017 because of medication usage."  Objections 2.  She does not explain

why that was an unfair conclusion, nor does she cite to any evidence which contradicts the ALJ's

determination that because in August 2017, she "was in no distress, enjoyed full range of all

joints with no swelling and demonstrated no weakness," no changes were made to her treatment

regimen, and she had stopped participating in physical and occupational therapy months prior,

her fibromyalgia appeared to be under control.  R. 25.  She simply argues that the ALJ should

have "account[ed] for the waxing and waning nature of the nerve condition prior to assessing it

to be controlled."  Objections 2.  But the ALJ did not find her fibromyalgia controlled based on

the results of one normal physical examination, which might have reflected her ability on a good

day, whereas she might have had more symptoms on a bad day.  This argument provides no

reason to find the ALJ's subjective symptom analysis flawed.

Stephanie also faults the ALJ for failing to address side effects from her medication and

their impact on her ability to work.  Objections 2.  In support of this argument, Stephanie points

to a medical source statement from her treating nurse practitioner, Stacy Roth, in which Roth

states that Stephanie's impairments caused memory issues, decreased concentration and focus,

and fatigue.  *Id.* (citing R. 547).  On its face, this statement says nothing about whether these

symptoms were caused by side effects from medication.  Stephanie also argues that she "testified

that her medications had prevented her from renewing her driver's license" and that "her

medications make her drowsy and dizzy" and that she "complained of the same thing to

providers."  *Id.*  At the hearing, she did testify that her "license expired on [her] birthday two

years ago" and that "the medications [she] was taking, [she] just didn't renew [her license]

because [she] really wasn't ready to drive."  R. 55.  She also testified that her medications cause

"drowsiness, dizziness."  *Id.* at 61.  But the Court can locate no record that supports that

Stephanie complained of these side effects to her medical providers.[5]  She only cites one record

in support, which actually indicates that she reported no dizziness.  Objections 2 (citing R. 517).

The ALJ did not err in failing to address the side effects from Stephanie's medication.

"[A]n ALJ is not required to provide a complete written evaluation of each piece of evidence,

including the side effects of medication."  *Labonne v. Astrue*, 341 F. App'x 220, 226 (7th Cir.

---

[5] There are references in the record of Stephanie complaining of dizziness.  *See* R. 713 (noting that Stephanie presented to the emergency department on April 9, 2014 complaining of dizziness); *id.* at 685 (noting that Stephanie presented to the emergency department with diarrhea, nausea, cramping abdominal pain, blood in the stool, and "a little" dizziness in July 2016).  According to a medication list in the record, Stephanie was not prescribed many of her medications until 2017, so the 2014 dizziness was clearly not a side effect of those medications.  *See id.* at 356–57.  Moreover, Stephanie's main issue when she went to the emergency department in 2016 was abdominal pain and she tested positive for clostridium difficile.  *Id.* at 685.  The record does not suggest the dizziness was a side effect of medication.

2009) (citation omitted); *see* SSR 16-3p, 2017 WL 5180304, at *5 (noting that not all types of evidence described in the SSR "will be available or relevant in every case").  Here, there is no evidence in the record beyond Stephanie's statement at the hearing that she suffered from side effects from her medication.  *See Labonne*, 341 F. App'x at 226 ("Aside from Labonne's testimony that her medications caused dizziness and drowsiness, the record contains virtually no evidence that she complained of her medications causing significant side effects.").  And her statement at the hearing was vague and did not indicate whether she was unable to work due to the dizziness and drowsiness caused by her medications.  *See Arnold v. Saul*, No. 1:19-CV-151-HAB, 2020 WL 1983695, at *3 (N.D. Ind. Apr. 27, 2020) (finding that the ALJ did not err in failing to discuss the plaintiff's claimed side effects because "there [wa]s no medical evidence that any of the medications caused the claimed side effects," there was no "clinical finding" that her medications caused side effects, and she had "not identified how any of the claimed side effects impaired her ability to work").  Absent a showing of impairment, the ALJ need not have discussed alleged side effects.  *Id.* ("While the side effects may very well have been annoying, there is no evidence that it resulted in any impairment.  In the absence of such a showing, the ALJ had no duty to discuss the claimed side effects.").

Even if the ALJ had erred by failing to discuss alleged side effects, it would be harmless.  In light of Stephanie's vague testimony and the fact that no medical records substantiate that she suffered side effects from her medication, the Court is convinced the ALJ's decision would not change if the case were remanded for her to consider side effects from Stephanie's medications.  *See McKinzey*, 641 F.3d at 892; *Rasmussen v. Astrue*, 254 F. App'x 542, 547 (7th Cir. 2007) (finding that the ALJ's failure to address the plaintiff's alleged drowsiness "more comprehensively" was harmless because the plaintiff "presented no evidence of her medication's side effects beyond her

own testimony, nor do the medical records support her claim that the drowsiness caused by her medications is so disabling that she cannot work").

Stephanie also notes that the ALJ "failed to account for [her] use of prescribed Seroquel nightly, Wellbutrin twice daily, and hydroxyzine as needed for her anxiety as well as Cymbalta." Objections 2.  True, these medications were not specifically mentioned in the ALJ's discussion of Stephanie's mental impairments.  But Stephanie fails to identify any consequence that occurred as a result.  The ALJ did not discount Stephanie's subjective reports based on a lack of prescription treatment.  *See* R. 26.  And to the extent Stephanie alleges any side effects from these prescription medications specifically, the same analysis as set forth above applies.

In this section of her objections, Stephanie also argues the ALJ erred by failing to acknowledge that "as of February 3, 2017, [she] required an 'emotional support animal' in order to manage her symptoms and function on a daily basis."  Objections 2–3 (citing R. 545).  In the memorandum in support of Stephanie's motion for summary judgment, this argument appeared in the section about the ALJ's treatment of Roth's opinion.  *See* Mem. Supp. Mot. Summ. J. 5. Regardless, the upshot of the argument appears to be the same—her need for an emotional support animal supports her claimed limitations and is consistent with finding that she has severe mental health symptoms that affect her ability to work.

But the ALJ provided an adequate discussion of Stephanie's mental health symptoms. The ALJ acknowledged Stephanie's testimony that she found it difficult to be in public, that she suffers anxiety on a daily basis, that she can remain in a crowded store for only thirty minutes, that she suffers from depression and feelings of worthlessness, and that she has daily crying spells.  R. 26.  The ALJ also highlighted the medical evidence of record which supported finding that Stephanie had limitations based on her mental impairments, including: that Stephanie sought

10

emergency care for chest pains and was diagnosed with general anxiety; that she reported difficulty functioning; that she was prescribed medications which had to be adjusted; that she was diagnosed with PTSD and depressive disorder; that she sought emergency care for anxiety, depression, and hallucinations (though she acknowledged she had used methamphetamine just two days before); that she was being treated for bipolar disorder, generalized anxiety disorder, and PTSD in May 2017; and that she suffered symptoms of chronic anxiety, worry, and periods of depression and irritability, along with "breakthrough symptoms of extreme depression and anxiety." *Id.*

The ALJ also noted medical evidence which was not indicative of severe mental limitations, including: that Stephanie "consistently presented for treatment, even during times of symptoms exacerbation, with appropriate mood and affect, orientation as to person, time and place and normal insight and judgment"; that she did not complain of hallucinations other than the time after she used methamphetamine; that she demonstrated appropriate comprehension, memory, knowledge, and abstract reasoning during a consultative examination; that she had not been hospitalized since the alleged onset date because of mental impairments; that the record did not contain treatment records from a counselor; and that the record showed she saw a nurse practitioner for medication management every six months. *Id.*

The ALJ also pointed to her discussion of Stephanie's mental impairments at step three. *Id.* at 27.  In that discussion, the ALJ found that Stephanie had mild limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in her ability to concentrate, persist, or maintain pace; and no limitations in her ability to adapt or manage herself.  *Id.* at 22.  In support of those conclusions, the ALJ cited to evidence in the record including Stephanie's testimony and statements in the record and medical evidence.

*Id.* (noting, for example, that the consultative psychological examiner found that Stephanie had working memory deficits, but that Stephanie reported she prepared meals, paid bills, went to appointments, took her medication, shopped, read, and did crossword puzzles).

The ALJ clearly built a logical bridge from the evidence of the record—including Stephanie's testimony, her other statements in the record, the results of mental examinations, and her daily activities—to her conclusion about Stephanie's mental limitations.  It is true that the ALJ failed to address a letter in the record written by Victoria Todd, a counselor, which indicated Stephanie had an emotional support animal which was "a necessary part of her treatment to help facilitate on-going management of her mental health symptoms."  *Id.* at 545.  "But an ALJ need not mention every piece of evidence, so long [as s]he builds a logical bridge from the evidence to h[er] conclusion."  *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).  She did so here.  And though an ALJ "must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position," *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000), it is not clear that the letter contradicts anything in the ALJ's decision.  It states that Stephanie has mental health symptoms that she needs to manage with the assistance of an emotional support animal.  *See* R. 545.[6]  The ALJ found that Stephanie suffered from severe mental impairments and that she suffered from symptoms which caused limitations in various areas of functioning.

The Court finds no error in the ALJ's subjective symptom analysis or her failure to mention the emotional support animal letter, so Stephanie's objection is overruled.

---

[6] Additionally, the Court notes that, at the hearing, Stephanie was asked whether she was using "[a]ny other treatment other than medications for [her] mental health issues," and she said no.  R. 63.  This conflicts with the letter insofar as the letter states that having an emotional support animal was "a necessary part of her treatment."  *Id.* at 545.

### b.  Nurse Practitioner's Opinion

Stephanie argues that the ALJ improperly dismissed treating nurse practitioner Roth's opinion.  Objections 3.  In the memorandum in support of her motion for summary judgment, Stephanie identified numerous alleged mistakes in the ALJ's treatment of Roth's opinion.  *See* Mem. Supp. Mot. Summ. J. 4–7.  Her objections do not make clear which arguments she is continuing to pursue, other than acknowledging that the treating physician rule does not apply to Roth because, under the Social Security Administration's rules at the time, she was not an acceptable medical source.  Objections 3.  Instead, she merely argues that "the ALJ still needed to weigh [Roth's] opinion using the same factors that apply to acceptable medical sources" and argues that a case cited in the R&R, *Sosh v. Saul*, 818 F. App'x 542 (7th Cir. 2020), is distinguishable, suggesting that her primary argument is that the ALJ did not adequately explain her reasons for discounting Roth's opinion.  *See* Objections 3.[7]  Therefore, the Court will consider that argument de novo.

The ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence . . . receive[d]."  20 C.F.R. § 404.1527(b); *id.* § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").  The ALJ considers the following factors in determining how much weight to give a medical opinion: (1) the examining relationship between the source and the plaintiff; (2) the treatment relationship, i.e., whether the source is the plaintiff's treating provider or only examined the plaintiff once; (3) how much relevant evidence is presented to support the opinion; (4) how consistent the opinion

---

[7] To the extent Stephanie is arguing that Judge Hawley erred by relying on *Sosh*, *see* Objections 3, that argument is rejected.  Judge Hawley was not comparing the facts of *Sosh* and this case.  Instead, he was simply reciting the legal principles set forth in *Sosh*, that is, that an ALJ need only minimally articulate her reasons for rejecting medical opinions and that not all of the factors identified in 20 C.F.R. § 404.1527 may be relevant for sources who are not acceptable medical sources.  R&R 14 (citing *Sosh*, 818 F. App'x at 547).  Regardless, the Court's review is de novo.

is with the record as a whole; and (5) whether the source is a specialist. *See id.* § 404.1527(c).

"If [an] ALJ discounts [a medical source's] opinion after considering the[] factors[ identified in

§ 404.1527(c)], [the court] must allow that decision to stand so long as the ALJ minimally

articulate[d] his reasons—a very deferential standard that [the Seventh Circuit] ha[s], in fact,

deemed lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (sixth alteration in original)

(quotation marks omitted).

The ALJ gave Roth's opinion some weight.  R. 27.  Roth opined that Stephanie had mild

limitations in understanding, remembering, and carrying out simple instructions and in making

judgments on simple work-related decisions, but moderate limitations with respect to complex

instructions and complex work-related decisions.  *Id.* at 546.  She explained that Stephanie

"struggle[d] with concentrating and focus at times" and that depression caused difficulty with

decision-making and memory.  *Id.*  Roth opined that Stephanie had marked limitations in

interacting with others—including the public, supervisors, and coworkers—explaining that

Stephanie had social anxiety and difficulty interacting in social settings.  *Id.* at 547.  The ALJ

explained that Roth's "opinion as to [Stephanie's] limitations in her ability to understand,

remember or apply [was] consistent with the other evidence of record, specifically Dr. Zagotta's

finding that [Stephanie's] anxiety cause[d] working memory deficits."  *Id.* at 27.  But the ALJ

found Roth's opinion on Stephanie's ability to interact with others "not supported by either her

treatment of [Stephanie] or the record as a whole."  *Id.*  The ALJ pointed to the fact that

Stephanie "live[d] with others, enjoy[ed] spending time with family and friends, shop[ped] in

stores and showed no difficulty in presenting for various appointments and physical therapy

sessions."  *Id.*  Further, in her discussion of whether Stephanie's impairments met or equaled a

listing at step three, the ALJ noted that Stephanie could deal appropriately with authority and that

14

she was noted to be pleasant and cooperative at medical appointments. *Id.* at 22; *see Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (noting that "it is proper to read the ALJ's decision as a whole").

The Court finds that the ALJ at least minimally articulated her reasons for giving Roth's opinion only some weight. It does not appear that Stephanie objects to the ALJ's treatment of Roth's opinions regarding her ability to carry out instructions. Instead, Stephanie's dispute appears to center on Roth's opinions about her social limitations. *See* Objections 3; Mem. Supp. Mot. Summ. J. 4–7. The ALJ did not find that Roth's opinions were entirely unworthy of credence; instead, the ALJ incorporated social limitations into her RFC finding. She found that Stephanie retained the RFC to have occasional interaction with coworkers with no tandem tasks, occasional interaction with supervisors, and no interaction with the general public. R. 23. She therefore disagreed with Roth's opinion only to the extent Roth opined Stephanie would be further limited in her ability to interact with coworkers and supervisors.

Stephanie makes no persuasive argument that the ALJ's assessment was inadequate. At summary judgment she argued that "[t]he ALJ[] failed . . . to account for what she was relying upon to dismiss . . . Roth's opinion about [Stephanie's] struggles to interact with coworkers/supervisors." Mem. Supp. Mot. Summ. J. 5. But, as explained above, the ALJ did explain what she was relying on: that Stephanie shopped at stores, appeared for medical appointments and was noted to be pleasant and cooperative, enjoyed spending time with family and friends, and got along with authority. Moreover, the Court reiterates that the ALJ did not use that information to find that Stephanie had no limitations in her ability to interact with coworkers and supervisors. Instead, she found Stephanie could interact with them only occasionally, which in the Social Security context means a maximum of one-third of the workday, *see* DI 25001.001

Medical & Vocational Quick Reference Guide A(53), Program Operations Manual System,

https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001 (effective May 30, 2018), and that she

could not work on tasks with coworkers.

Stephanie also argued that "the ALJ did not explain how [her] daily activities

contradicted . . . Roth's opinion that [she] could not tolerate the social interaction pressures of

work." Mem. Supp. Mot. Summ. J. 6–7. She argues that her daily activities—like shopping,

going to the doctor, and living with others—involved the support of her parents. *Id.* at 6. But

Stephanie's daily activities were not the primary reason the ALJ discounted Roth's opinion. The

ALJ relied on statements in the record Stephanie made that she "get[s] along with everyone," R.

289, and gets along well with authority figures, *id.* at 321, and a function report where Stephanie

indicated she had no problems getting along with others, *id.* at 320. The ALJ also noted that

providers described Stephanie as pleasant and cooperative. *Id.* at 22 (citing *id.* at 383, 460, 497,

579, 589). The ALJ identified the evidence she relied on to find that Stephanie had more ability

to interact with familiar people like coworkers and supervisors than Roth opined. Stephanie's

arguments to the contrary ask the Court to reweigh the evidence, which it cannot do.[8]  *See*

*McKinzey*, 641 F.3d at 889.

Stephanie also argued at summary judgment that the ALJ erred by failing to "mention or

cite to any of . . . Roth's own progress notes," Mem. Supp. Mot. Summ. J. 7, and by failing to

---

[8] Stephanie further argued that the ALJ did not "explain how being able to interact appropriately with family, friends, and authority figures such as her medical providers conflict[ed] with . . . Roth's opinion that [Stephanie] struggle[d] with being in public." Mem. Supp. Mot. Summ. J. 5. But the ALJ found no such conflict. Instead, the ALJ credited Stephanie's testimony that she struggled with crowds and Roth's opinion that Stephanie had marked limitations in interacting with the public by finding Stephanie could not have any interaction with the public. R. 27. Stephanie also argued that the ALJ "failed to acknowledge that Dr. Zagotta's opinion was also consistent with . . . Roth's social interaction diagnosis of the B criteria because Dr. Zagotta too confirmed [Stephanie's] need for additional assistance in functioning." Mem. Supp. Mot. Summ. J. 7. Dr. Zagotta, a consultative examiner, concluded that Stephanie "would need assistance managing her funds" if she were awarded benefits "related to the functional impacts of her psychiatric conditions." R. 463. But he said nothing about her social functioning, so the Court fails to see the relevance of his statement to Roth's opinions about Stephanie's social limitations.

"offer[] [a] description of inconsistent evidence from . . . Roth's treatment notes," *id.* at 5.  The

ALJ did indicate that Roth's opinion was not consistent with her treatment of Stephanie without

citing to treatment records.  In light of the ALJ's explanation of how the record as a whole was

inconsistent with Roth's opinion about Stephanie's ability to interact with coworkers and

supervisors, however, the failure to explain why Roth's treatment was inconsistent with her

opinion is harmless.  *Cf. McKinzey*, 641 F.3d at 890–91 (upholding the ALJ's credibility

determination even where the ALJ made some mistakes because the ALJ cited to other

substantial evidence to support her conclusion); *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th

Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are . . . .");

*Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (declining to overturn an ALJ's credibility

determination even though it was "not flawless").  Moreover, Stephanie does not identify any

treatment records that are supportive of Roth's opinion.

The ALJ at least minimally articulated her reasons for assigning Roth's opinion only

some weight.  Accordingly, Stephanie's objection is overruled.

### c.  Mental Limitations

At summary judgment, Stephanie argued that "[t]he ALJ failed to include all of [her]

mental limitations into the hypothetical and RFC."  Mem. Supp. Mot. Summ. J. 7 (capitalization

altered and emphasis omitted).  Specifically, she claimed that the ALJ failed to adequately

account for her moderate limitations in concentration, persistence, and pace.  *Id.* at 7–10.  Judge

Hawley recommends rejecting this argument, finding that "[t]he ALJ adequately considered the

. . . evidence of record" and crafted an RFC responsive to the limitations she found.  R&R 17–

19.  Stephanie objects, arguing that "neither the ALJ nor the Magistrate Judge mention that . . .

the State Agency reviewers fe[lt] she would . . . have problems with performing activities within

17

a schedule without additional breaks" and that the ALJ failed to mention moderate limitations in understanding and carrying out detailed instructions.  Objections 4.

"[B]oth the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record . . . . includ[ing] any deficiencies the claimant may have in concentration, persistence, or pace."  *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).  "An ALJ need not use specific terminology" in formulating the hypothetical given to the vocational expert or the RFC.  *See DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019) (quotation marks omitted).  But the Seventh Circuit has "repeatedly rejected the notion that . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace."  *Id.* (quotation marks omitted); *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) ("The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity.").  The Seventh Circuit has, however, "let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform."  *O'Connor-Spinner*, 627 F.3d at 619.

At step three, the ALJ found that Stephanie had moderate limitations in her ability to concentrate, persist, or maintain pace.  R. 22.  The ALJ acknowledged Stephanie's contentions that she could concentrate for only fifteen minutes before requiring a break and that she had trouble completing tasks, but also pointed to Stephanie's statements that she could prepare meals, watch television, read, do crossword puzzles, manage funds, use the internet, and handle her own medical care.  *Id.*  While an ALJ's findings at step three "are not an RFC assessment,"

SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996), her opinion "must . . . be consistent within

itself and build a logical bridge for the ALJ's reasoning." *Holland v. Comm'r of Soc. Sec.*, 195

F. Supp. 3d 1011, 1021 (N.D. Ind. 2016).  Accordingly, here, the ALJ had to incorporate

Stephanie's moderate limitations in concentration, persistence, or pace into the RFC and the

hypothetical given to the VE.

The Court finds that the ALJ did so.  In formulating the RFC, the ALJ noted the step

three analysis, as well as both the medical evidence that supported finding Stephanie limited and

the evidence that was inconsistent with finding her limited.  *See* R. 26–27.  The ALJ also

considered Roth's opinion that Stephanie was mildly limited in her ability to understand,

remember, and carry out simple instructions and in her ability to make judgments on simple

work-related decisions and moderately limited in her ability to understand, remember, and carry

out complex instructions and in her ability to make complex work-related decisions.  *See id.* at

27.  The ALJ found "Roth's opinion as to [Stephanie's] limitations in her ability to understand,

remember or apply . . . consistent with the other evidence of record" and noted Roth's opinion

that Stephanie had "difficulty concentrating and focusing at times."  *Id.*

The ALJ also considered two state agency reviewers' opinions, which stated that

Stephanie had "moderate limitation in two of the four areas of mental functioning."  *Id.* (citing

*id.* at 82–95 and *id.* at 113–27).  As relevant here, one state agency reviewer opined that

Stephanie had moderate difficulties in maintaining concentration, persistence, or pace.  *Id.* at 87.

He indicated that she was moderately limited in her ability to carry out detailed instructions, her

ability to maintain attention and concentration for extended periods, and her ability to complete a

normal workday and workweek without interruptions from psychologically based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods.  *Id.* at

92.  He also provided a narrative RFC, in which he opined that she "retain[ed] the mental capacity to understand, remember and concentrate sufficiently in order to carry out one and two-step instructions/tasks and to sustain efforts for a normal work period," that she "could make simple work related decisions," and "could adapt to simple, routine changes and pressures in the work environment."  *Id.* at 93.  The other state agency reviewer provided the same opinions.  *Id.* at 124–25.  The ALJ gave the state agency reviewers' opinions some weight, explaining that she had additional records relating to Stephanie's fibromyalgia and hip bursitis which led her to find that Stephanie had more restrictive exertional limitations than included in the state agency reviewers' opinions.  *Id.* at 27.

The ALJ included all the limitations opined to by the state agency reviewers in the narrative portion of their opinions in the RFC and the hypothetical given to the ALJ.  The RFC assessment provided that Stephanie could "perform work that can be learned in 30 days or less, with simple routine tasks, simple work-related decisions and routine work place changes."  *Id.* at 23.  And the VE was given a hypothetical with all the restrictions included in the RFC.  *Id.* at 76–77.  It was permissible for the ALJ to rely on the state agency reviewers' opinions to determine Stephanie's functional limitations.  *See Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019) ("[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates . . . findings [of mental limitations] into an RFC determination.").  And moreover, the Seventh Circuit has approved RFCs and VE hypotheticals that omit reference to concentration, persistence, and pace if they adequately account for the limitations identified by medical providers in the record.  *See Simons v. Saul*, 817 F. App'x 227, 232 (7th Cir. 2020) ("The questions [asked of the VE] reflected the 'light work' the reviewing consultants believed Simons could undertake and were consistent with the state psychological consultant's conclusion that she

could manage simple tasks with limited pressure and complexity."); *Morrison v. Saul*, 806 F. App'x 469, 474 (7th Cir. 2020) (holding that limiting the plaintiff "to jobs involving simple and detailed, one-to-five step instructions only adequately accounted for the only deficits in concentration, persistence, and pace that the ALJ found supported by the record," explaining that the restriction was drawn "from the opinion of the medical expert . . . which is a permissible way of translating medical evidence into work-related restrictions" (quotation marks omitted)); *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002) (finding the ALJ did not err in finding the plaintiff retained the mental RFC to perform repetitive low-stress work when he relied on a physician's opinion that "because [the plaintiff] was not significantly limited in seventeen of twenty work-related areas of mental functioning, he retained the mental RFC to perform repetitive, low-stress work" (quotation marks omitted)); *cf. Baldwin v. Berryhill*, 746 F. App'x 580, 584 (7th Cir. 2018) (noting, in dicta, that "the ALJ did not err when he decided to ignore the finding from an October 2013 psychological evaluation of Baldwin indicating that he was moderately limited in concentration and pace" because he "relied instead on the psychologist's explanation in the narrative assessment in the same report that Baldwin had the concentration and pace necessary to fulfill a normal workday" (quotation marks omitted)); *Joel A. v. Saul*, No. 19 CV 50156, 2020 WL 6075866, at *5 (N.D. Ill. Oct. 15, 2020) (distinguishing cases where the Seventh Circuit has found the ALJ failed to adequately account for limitations in concentration, persistence, and pace from cases where "the ALJ . . . had . . . [a] 'medical translator' helping him formulate the appropriate RFC restrictions").

In her objections, Stephanie argues that the ALJ "omitted any mention" of the reviewers' opinion that she was moderately limited in understanding and carrying out detailed instructions and performing activities within a schedule without additional breaks.  Objections 4.  She also,

however, appears to acknowledge that because the ALJ limited her to only simple, routine tasks, the ALJ adequately accounted for the agency reviewers' opinion that she was limited in understanding and carrying out detailed tasks. *See id.* (noting that "the simple and routine tasks would have accounted for" her "moderate impairments with detailed tasks"). The Court agrees and notes further that this addresses Roth's opinion that Stephanie had moderate limitations in understanding, remembering, and carrying out detailed instructions. As for the agency reviewers' indication that she was moderately impaired in her ability to perform activities in a schedule without additional breaks, the agency reviewers translated this to a specific RFC finding that Stephanie "retain[ed] the mental capacity . . . to sustain efforts for a normal work period." R. 93, 143. The ALJ did not err by relying on the RFC finding in the narrative section of the reports. *See Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) ("[A]n ALJ may rely on a doctor's narrative where it adequately translates . . . observations [contained in the checklist section of the opinion]."); *Burmester*, 920 F.3d at 511 ("The ALJ appropriately relied on the narrative statement in crafting the hypothetical to the vocation expert and the RFC.").

The ALJ incorporated the limitations in concentration, persistence, and pace she found to be supported by the medical record into her RFC assessment and in the hypothetical given to the VE. *See Yurt*, 758 F.3d at 857. Stephanie's objection, therefore, is overruled.

## CONCLUSION

Accordingly, Plaintiff Stephanie N.'s objections, ECF No. 20, are OVERRULED, and the Report and Recommendation, ECF No. 19, is ADOPTED. Stephanie's Motion for Summary Judgment, ECF No. 12, is DENIED, and Defendant Commissioner of the Social Security Administration Andrew Saul's Motion for Summary Affirmance, ECF No. 16, is GRANTED.

The Commissioner's decision in this matter is AFFIRMED.  The Clerk is directed to enter judgment and close the case.

Entered this 16th day of November, 2020.

s/ Sara Darrow

SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE